IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TMS ENVIROCON, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-772C |
| | ) | |
| UNITED STATES OF AMERICA, | ) | (Judge Baskir) |
| | ) | |
| Defendant. | ) | |

JOINT PRELIMINARY STATUS REPORT

Pursuant to the Appendix A of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff, TMS Envirocon, Inc. ("TMS"), and defendant, the United States, respectfully submit this Joint Preliminary Status Report ("JPSR").

**4.A. Does the court have jurisdiction over the action?**

In the complaint, TMS alleges:

15. As noted above, TMS had not requested this alleged "final decision" nor had TMS submitted a certified claim respecting the Shaw REA to the Government, as required pursuant to the Contracts Dispute Act and other applicable law or regulation.

16. Given these facts, TMS questions jurisdiction under the Contract Disputes Act; however, to the extent jurisdiction does lie TMS files this protective appeal, which it timely filed within one year of TMS's receipt of the alleged final decision.

Complaint, ¶¶ 15-16; see Complaint, ¶¶ 8-14. Pursuant to paragraph 3 of

the Court's order, dated November 27, 2006, the parties respectfully request that the Court establish a briefing schedule regarding jurisdictional issues at the preliminary status conference.

TMS contends that the contracting officer lacked authority to issue a final decision because no claim had been submitted. Thus, TMS contends that there is no valid final decision, and no jurisdiction for this Court to entertain this case. However, TMS filed the complaint to protect its rights because the Contracting Officer averred jurisdiction in her final decision; TMS' subcontractor, Shaw, believes jurisdiction lies herein; and TMS appreciates that the Court may conclude jurisdiction lies herein.

The United States agrees that no claim was submitted, no final decision could be properly issued, and that this Court lacks jurisdiction to consider the allegations in the complaint.

TMS contends that to the extent the final decision was not effective to establish jurisdiction merely because no certification was submitted by TMS, such a defect can be corrected at any time prior to the entry of final judgment pursuant to 41 U.S.C. § 605(6). Appendix, Tab 7. Thus, TMS contends that the Court should not rule that jurisdiction is lacking merely upon the grounds that no proper certification has been submitted.

The United States contends that the missing certification is a second legally sufficient reason supporting a decision that jurisdiction is lacking in this case because TMS has pled its unwillingness to certify the request for equitable adjustment prepared by its subcontractor. See Complaint, ¶ 9 ("Without taking position as to the merits of this requested subcontractor pass-through").

The United States contends that, at a minimum, the interests of justice and judicial economy require that TMS decide whether to certify the purported "claim" at the outset of proceedings before the Court. The United States further contends that it is not certain that TMS will certify the subcontractor claim because TMS is aware that various facts are inconsistent with the subcontractor claim.

The United States further contends that the interests of justice and judicial economy would be served if the complaint were dismissed. In that event, TMS could make a decision regarding the scope of the claim that TMS is willing to certify, and TMS could submit that claim to the contracting officer for a final decision. Indeed, this process for narrowing the issues in dispute was contemplated by Congress when the certification requirement was included in the Contract Disputes Act, 41 U.S.C. 601, et seq.

TMS does not agree with these contentions as, among other things, they are not consistent with the applicable certification requirements. But for the Contracting Officer's unilateral action in deeming the Shaw REA as a claim, the parties would have had opportunity to establish the basis of Shaw's proposals and the Government's positions respecting them. Without such discussions, TMS cannot determine if there is material disagreement between it and the Government, or if so as to what, per FAR Part 33.201. Once this can be determined, through discovery or otherwise, any required certification can be made prior to the entry of final judgment, and proceeding as such is, TMS contends, the appropriate approach under the facts and circumstances here.

**B. Should the case be consolidated with any other case and the reasons therefore?**

No.

**C. Should trial of liability and damages be bifurcated, and the reasons therefore?**

No.

**D. Should further proceedings in this case be deferred pending consideration of another case before this court or any other tribunal**

**and the reasons therefore?**

No.

**E. In cases other than tax refund actions, will a remand or suspension be sought and the reasons therefore and the proposed duration?**

No.

**F. Will additional parties be joined and, if so, a statement describing such parties, their relationship to the case, and the efforts to effect joinder and the schedule proposed to effect joinder?**

No.

**G. Does either party intend to file a motion pursuant to RCFC 12(b), 12(c) or 56, and, if so, a schedule for the intended filing?**

Pursuant to paragraph 3 of the Court's order, dated November 27, 2006, the parties respectfully request that the Court establish a briefing schedule regarding jurisdictional issues at the preliminary status conference.

Neither party contemplates filing any other dispositive motion at this time.

**H. What are the relevant issues?**

The parties respectfully submit the following separate statements of relevant factual and legal issues.

Statement by TMS

I. BRIEF DESCRIPTION OF FACTUAL ISSUES

1. The Department of the Air Force ("Air Force") awarded contract no. F44600-01-C-0029 (the "Contract") to TMS, a certified small business, for repairs of certain non-compliant water mains at Langley Air Force Base. See Appendix, Tab 1 (Standard Form 1442 Award portion of Contract). Because of the page limitation for the JPSR Appendix, only this excerpt of the Contract is included; however, the entire contract can be made available as requested by the Court.

2. TMS subcontracted portions of the Contract work to IT Corporation ("IT Corporation") by written subcontract dated effective October 15, 2001 ("Subcontract").

a. IT Corporation's scope of work was, generally, for them to replace existing drinking water distribution piping in accordance with the Contract's specifications and drawings.

b. At the time, IT Corporation was TMS' mentor in conjunction

with a Department of Defense, Department of the Navy, sponsored Mentor-Protégé Program.

c. Subsequent to entering into the Subcontract, IT Corporation's rights and obligations under the Subcontract were assigned to Shaw Environmental, Inc. ("Shaw") pursuant to an Order entered April 25, 2002 by the United States Bankruptcy Court for the District of Delaware.

3. During construction, TMS encountered various differing site conditions affecting its work, and there were other changes associated with the Contract work.

4. While various modifications to the Contract were issued by the Government for these, TMS believes additional adjustments remain due (collectively "Changes").

5. By "Request for Equitable Adjustment" dated March 17, 2004 ("Shaw REA"), Shaw submitted to TMS its certified proposal for subcontract adjustments sought by Shaw by reason of the Changes, which Shaw requested TMS to submit to the Government for review, comment, and negotiation.

6. Sizewise, the Shaw REA is included in a 4" three-ring binder that was submitted to the Government for its review, comment and negotiation. Because of the page length limitation of the appendix, the complete Shaw REA is not included therein. Included at Appendix, Tab 2 are, however, copies of two of the REA sections demonstrating Shaw's analysis of the basis and quantum of its alleged impacts. These are broken down into two subtabs in Appendix, Tab 2 as follows: Appendix, Tab 2A is Section 1.0 of the Shaw REA, which summarizes the bases for the REA and the related impacts detailed later in the REA. Appendix, Tab 2B is Section 7.0 of the Shaw REA, which summarizes Shaw's cost analysis, including the "measured mile" approach utilized by Shaw to calculate the value of the resulting impacts. A complete copy of the Shaw REA can be submitted as requested by the Court.

7. Without taking position as to the merits of this requested subcontractor pass-through, TMS submitted the Shaw REA to the Government.

8. By Memorandum dated February 17, 2005, the Government informed TMS that the Government had reviewed the Shaw REA and was denying it subject to the findings set forth therein, relating to certification of

the REA by TMS pursuant to DFAR 243.204-70. Copy of this memorandum is included in the Appendix, Tab 3.

9. In response to this memorandum, TMS responded by letter dated March 14, 2005, which, *inter alia*, included TMS' certification pursuant to DFAR 243.204-70, and related statements, and inquiring whether any additional information was needed by the Government respecting the Shaw REA. Copy of this letter is included in the Appendix, Tab 4.

10. By letter dated July 26, 2005, TMS made additional inquiry regarding the status of the Government's review of the Shaw REA, further confirming TMS' understanding that the Government did not require additional supporting information or documents for its ongoing review of the Shaw REA. Copy of this letter is included in the Appendix, Tab 5.

11. No further request for additional supporting information or documents was made by the Government to TMS, and by memorandum dated November 15, 2005 the Contracting Officer advised TMS that the Shaw REA was "denied in its entirety" and stating further that the memorandum was the "final decision of the Contracting Officer", with applicable appellate rights set forth therein. Copy of this memorandum

was attached to the Complaint as Exhibit 1 and is included with the Appendix at Tab 6.

12. This appeal was timely filed pursuant to the CDA by TMS on Shaw's behalf within one year of TMS' receipt of this "final decision."

13. Eighteen Contract modifications were issued by the Government.

a. Modifications 2, 6, 7, and 10 had no release language included within them.

b. While modifications 8, 9, 12, 14, 16, 17, and 18 included release language in them, they were signed as such by TMS with the understanding that the Government would not permit TMS to modify this portion of the modifications but that the Government agreed there was no release effect intended by the execution of the modifications and that TMS's rights to additional adjustment, to either time or compensation, or both, was reserved, including as to resulting impacts, overall, to the project and/or schedule. TMS submitted its written confirmation of this with those modifications, copies of which are included at Appendix, Tab 8.

c. Modifications 1, 3, 4, 5, 11, 13, and 15 also had similar release language. TMS, however, similarly executed them with the

understandings summarized above that they did not have preclusive effect, although TMS did not similarly submit written confirmation of this with them. The Government acknowledged similar understanding to that of TMS, including as set forth in the Contracting Officer's December 22, 2003 email included at Appendix, Tab 9, which relates to the agreement for TMS to sign Modification P000011, which included release language, but in this email the Contracting Officer acknowledges that the parties would negotiate further adjustments for the changes after this modification's execution.

14. The Controller for TMS, Anne S. Ray, inadvertently submitted for final payment on or about October 3, 2006, copy of which was included with the Government Answer. Ms. Ray did not have authority to waive outstanding Contract claims, and did not intend to do so by seeking payment of the $4,262.73 Contract balance the Government had acknowledged due, but not yet paid.

15. The Government did not pay the $4,262.73 Contract balance until on or about January 10, 2007, as confirmed in the "myInvoice Detail Report" attached to the Government's Answer. This payment was made

after the Complaint herein had been filed and the Government, therefore, aware of the pending claims.

## II. BRIEF DESCRIPTION OF LEGAL ISSUES

1. Was the Government's November 15, 2005 Memorandum a "final decision" for purposes of the Contract Disputes Act, 41 U.S.C. § 601, *et seq.*, and thus is there jurisdiction for this appeal? Alternatively, can any potential defect associated with the certification be cured pursuant to 41 U.S.C. § 605(c)(6)? Copy of this special jurisdictional code provision is included with the Appendix, Tab 7.

2. If there is jurisdiction,

a. Was Shaw's work affected in the manner and amount alleged by Shaw in the Shaw REA, and therefore compensation due therefore as sought in the Complaint, or alternatively in other manner or amount?

b. Regardless of alleged entitlement, are the subject pass-through "claims" nevertheless barred by the affirmative defenses alleged in the Government's answer; to-wit:

i. Release pursuant to the October 3, 2006 release attached as Exhibit 1000 to the Government's Answer;

ii. Final payment; and/or

iii. Accord and satisfaction.

## III. BRIEF DESCRIPTION OF CLAIMS

The following briefly describes TMS' claims herein:

1. The Shaw REA proposes $2,403,325 for contract adjustments associated with delays and impacts as analyzed by Shaw in the Shaw REA. These damages are associated with various Government acts and omissions as set forth in Paragraphs 17 - 19 of the Complaint, and include the following:

a. The Government failed to disclose that the Contract documents, including the plans, were based on limited and outdated information.

b. The Government provided deficient and inaccurate Contract documents, including:

1) Incomplete data, inadequate site survey, and faulty design.

2) Unknown, unexpected, and undisclosed subsurface conditions, including as regards underground utilities, utility crossings, and

other interferences and obstructions that were unidentified, mismarked, missed, and mislocated.

c. The Government improperly, untimely and inappropriately managed the Contract, including:

1) Failing to timely address and resolve required modifications and related work requirements, which in turn variously delayed, suspended, and resequenced work.

2) Failing to to provide an approved material and equipment lay-down area from October 18, 2002 through November 19, 2002.

3) Failing to timely determine work requirements, including work additions and de-scoping.

d. The Government suspended, restricted, and resequenced work.

e. The Government required additional excavation and backfilling.

f. The Government omitted and/or required other design errors and omissions and engineering and construction changes to the Contract requirements.

2. The Shaw REA includes Shaw's related scheduling and work disruption analyses, and the methodology for Shaw's calculations. See e.g., Appendix, Tab 2A and 2B.

3. To the extent Shaw's assertions are correct:

a. The Government is obligated to adjust the Contract's price and performance period commensurate with the time and money impacts respecting the same.

b. The Government's failure to adjust the Contract's price and performance period as requested in the Shaw REA is a breach of the Government's obligations, express and implied.

c. The Government's refusal to so adjust the Contract's price and performance period is a breach of the Government's Contract and warranties associated therewith.

d. The Government's refusal to so adjust the Contract's price and performance period is not justifiable, substantially or otherwise.

4. Alternatively, to the extent Shaw's assertions are correct, the Government's acts and omissions so materially altered the nature of the Contract as respected Shaw's work so as to constitute a "cardinal change" respecting the same, for which Shaw, through TMS, is entitled to the

reasonable and just value of Shaw's resulting work, labor and materials. See e.g., Wunderlich Contracting Co. v. United States, 351 F.2d 956 (Ct.Cl. 1965).

5. To the extent of entitlement therefore, TMS seeks markups on said amounts, or such other amounts as awarded, for 10% field overhead, 10% profit, 5.5% G&A and 1% bond, or such other markups as awarded. *See* Complaint.

6. The pass-through claims are not barred as a matter of law as alleged by the Government in the Government's Answer under the facts of this Contract, including because:

a. The Government has not identified specific documents relied upon for the defense of accord and satisfaction. To the extent, however, the Government relies upon the release language in certain of the modifications, these are not dispositive because:

1) The modifications, even presuming *arguendo* any release language in them is enforceable, are not dispositive of the claims herein and/or were not applicable to the claims herein.

2) There was not intention between the parties for the modifications to effect an accord and satisfaction between the parties as relates to the modifications.

3) There was conduct of the parties acknowledging the claims after the purported release(s).

4) The releases in question were signed under duress in that the Government refused to modify the Contract for adjustments the Government acknowledged were due without the inclusion of release language in the modifications.

5) TMS executed the modifications in question based upon its understanding, expressed to the Government, that the inclusion of the release language was required by the Government but would not be relied upon by the Government, and thus the releases were the result of fraud and/or mutual mistake to the extent the Government takes different position now.

6) The releases, to the extent effective, were obvious mistakes or oversights.

7) Some or all of the releases, depending upon which the Government relies, were not signed by an agent authorized by TMS to

release such claim as those the Government claims are precluded by the releases.

b. With respect to the Government's claim that TMS' claims are barred by final payment, that position is not dispositive because

1) There was not consideration for such release effect since the monies for which TMS submitted payment and that were paid by the Government were due and owing.

2) The signatory of the release form, Anne S. Ray, was not authorized by TMS to release such claims as those the Government claims are precluded by this release.

3) TMS' submission for final payment was inadvertent as respects the release effect on outstanding claims, which was an obvious mistake or oversight.

4) Before it made the alleged final payment for the Contract, the Government was aware that this action had been filed and the additional Contract adjustments as sought therein claimed, and thus the alleged final payment does not have the preclusive effect alleged.

Statement by the United States

I. Brief Statement Of Factual Background

The contract required TMS to replace the drinking water pipes at Langley Air Force base in Virginia, and to perform various related tasks. It is undisputed that the scope of work changed over time. There were 18 modifications to the contract.

By mutual agreement, the parties added certain work to the contract, and subtracted certain work. In addition, the parties agreed that certain differing site conditions were encountered by TMS during job performance. On several occasions, the Air Force paid TMS additional amounts to compensate for differing site conditions, and TMS executed releases of claims as part of the bi-lateral contract modifications.

In the complaint, TMS alleges that it never submitted a claim to the contracting officer. TMS further alleges that it has never certified any claim.

II. Legal Issues

A. Whether this Court possesses jurisdiction to consider the allegations contained in the complaint?

B. Assuming for the sake of argument that the Court possesses

jurisdiction, whether TMS is bound by the releases set forth in the bi-lateral modifications?

C. Assuming for the sake of argument that the Court possesses jurisdiction, whether TMS is bound by a release of all claims executed by TMS (through its Comptroller) on October 3, 2006, and final payment by the United States on January 10, 2007?

D. Assuming for the sake of argument that the Court possesses jurisdiction, and assuming for the sake of argument that not all of the allegations of breach of contract in the complaint are foreclosed by releases, whether TMS can prove any breach of contract and any specific amount of damages directly caused by such breach or breaches?

**I. What is the likelihood of settlement? Is alternative dispute resolution contemplated?**

In the view of the United States, settlement is unlikely because this case is likely to be dismissed for lack of jurisdiction. TMS believes that settlement could be possible if the parties took the opportunity to engage in further discussion.

The parties agree that the early neutral evaluation conference should occur. The United States suggests that no alternative dispute resolution

proceedings beyond the early neutral evaluation conference should occur until the Court decides whether it possesses jurisdiction to consider this case. TMS suggests that alternative dispute resolution proceedings be scheduled before the Court decides whether it possesses jurisdiction.

**J. Do the parties anticipate proceeding to trial? Does any party or do the parties jointly request expedited trial scheduling?**

Trial is likely if this case is not dismissed for lack of jurisdiction. The parties do not believe this case is appropriate for expedited trial scheduling and therefore do not request an expedited trial schedule.

**K. Are There Special Issues Regarding Electronic Case Management Needs?**

No.

**L. Is there any other information of which the court should be aware at this time?**

No.

**5. Proposed Discovery Plan**

The parties respectfully suggest that discovery be stayed until such time as the Court may decide that it possesses jurisdiction to consider the complaint. Accordingly, the parties respectfully request that no discovery

schedule be set at this time.

In the event that the Court decides that discovery should begin immediately, the parties respectfully request that the Court establish the following schedule:

1. Fact discovery shall begin immediately following the preliminary status conference. No depositions shall be noticed until the parties have exchanged documents in response to document production requests, unless the parties agree to depositions at an earlier time. Fact discovery should be completed by June 30, 2008. All requests pursuant to RCFC 31, 33, 34 and 36 served after May 31, 2008, shall be deemed untimely.

2. The party with the burden of proof regarding an issue shall disclose its testifying experts, the information required by RCFC 26(a)(2), and all expert reports by August 31, 2008.

3. All rebuttal experts, required information, and expert reports shall be disclosed by October 15, 2008.

4. All expert discovery shall be completed by November 30, 2008.

5. The meeting of counsel required by RCFC, Appendix A, paragraph 13 shall take place no later than December 15, 2008. At this meeting, the parties shall exchange a list of trial exhibits and a list of

summary exhibits that may be offered at trial for the truth of the statements contained in such exhibits. The parties shall also exchange information concerning proposed summary exhibits, as required by RCFC, Appendix a, paragraph 13. In addition, the parties shall exchange witness lists, as required by the same rule.

6. TMS shall file its memorandum of contentions of fact and law, as required by RCFC, Appendix A, paragraph 14(a), its witness list, as required by RCFC, Appendix A, paragraph 15, and its exhibit list, as required by RCFC, Appendix A, paragraph 16, by February 5, 2009.

7. The United States shall files its memorandum of contentions of fact and law, as required by RCFC, Appendix A, paragraph 14(b), its witness list, as required by RCFC, Appendix A, paragraph 15, and its exhibit list, as required by RCFC, Appendix A, paragraph 16, by March 5, 2009.

8. The pretrial conference shall be held on March 26, 2009.

Respectfully submitted,

S/ Neil S. Lowenstein
Neil S. Lowenstein
Vandeventer Black LLP
101 W. Main St., Suite 500
500 World Trade Center
Norfolk, VA 23510
Tele: (757) 446-8600
Fax: (757) 446-8670

Counsel for Plaintiff

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

S/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

S/ James W. Poirier
JAMES W. POIRIER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St, N.W
Washington, D.C. 20530
Tele: 202-616-0856
Fax: 202-514-7969

Attorneys for Defendant

April 9, 2007

# CERTIFICATE OF FILING

I hereby certify that on April 9, 2007, a copy of the foregoing "JOINT PRELIMINARY STATUS REPORT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

S/ James W. Poirier

# APPENDIX